1

1          - VOLUME C -

2          IN THE UNITED STATES DISTRICT COURT

3          IN AND FOR THE DISTRICT OF DELAWARE

4                    - - -

5   UNITED STATES OF AMERICA,    :    CRIMINAL ACTION
                                 :
6          Plaintiff            :
                                 :
7          v.                   :
                                 :
8   DARRYL CHAMBERS,             :
                                 :
9          Defendant            :    NO.  97-105 (RRM)

10                   - - -

11                          Wilmington, Delaware
                            Wednesday, September 2, 1998
12                          10:26 o'clock, a.m.

13                   - - -

14  BEFORE:  HONORABLE RODERICK R. McKELVIE, U.S.D.C.J.

15                   - - -

16  APPEARANCES:

17              ROBERT J. PRETTYMAN, ESQ.,
                Assistant United States Attorney
18
                   Counsel for Plaintiff
19
                JOSEPH W. BENSON, P.A.
20              BY:  JOSEPH W. BENSON, ESQ.

21                 Counsel for Defendant

22                   - - -

23                          Valerie J. Gunning
                            Official Court Reporter
24

25      

2

1

2                          P R O C E E D I N G S

3

4              (Proceedings commenced at 10:26 a.m.)

5

6              THE COURT:  All right.  You may proceed.

7       Your client is back on.  All right, Mr.

8   Chambers.

9                            - - -

10                   DEFENDANT'S TESTIMONY

11                         CONTINUED

12

13              THE WITNESS:  Your Honor, may I say something?

14              THE COURT:  You need to --

15              THE WITNESS:  Mr. Benson?

16              MR. BENSON:  May I approach?

17              (Pause while the defendant and Mr. Benson

18   conferred.)

19              MR. BENSON:  He wants to affirm because of

20   his faith.  Sorry, Judge.

21

22                   ... DARRYL CHAMBERS, having been

23              duly affirmed as a witness, was resumed

24              and testified further as follows ...

25

1

2                         DIRECT EXAMINATION

3                            CONTINUED

4    BY MR. BENSON:

5    Q.    Darryl, when we stopped yesterday, we were just

6    about winding down, but what I want to do is just take a

7    very few minutes closing out your testimony to try to

8    put it together as far as your transactions with Linette

9    and with Faye; okay?

10   A.    Yes.

11   Q.    So -- now, you've got to approach the microphone so

12   that the Judge can hear you --

13   A.    Okay.

14   Q.    -- and everybody else.

15              Basically, what I want you to do is to, as

16   best you can remember and describe to the Judge, when

17   you started getting involved with this crack cocaine,

18   cooking it, et cetera.  And before I ask you that question,

19   I want to ask you one other question.  Other than the

20   times that you cooked the cocaine, either yourself or

21   with those two women that were at Faye's house, did you

22   ever sell or deal crack cocaine?

23   A.    No, sir.

24   Q.    Never?

25   A.    No.

Chambers - direct                                    4

1   Q.    All the drug transactions that you were involved

2   in prior to that incident first starting were powder

3   cocaine?

4   A.    That's correct.

5   Q.    For sure?

6   A.    Yes.

7   Q.    Okay.

8              Now, go ahead.  Just reiterate this as best

9   you can.

10  A.    Well, it started in -- well, I have to take you a

11  couple steps forward first.  In early October, Ms.

12  Crawford -- not Miss -- Faye.

13  Q.    Faye Bullock?

14  A.    Yes.  Miss Faye Bullock.  Faye had allowed me to

15  come in the house because the policeman got me one day

16  so she said I can come in the house, but leave the drugs

17  outside.  So several weeks after that she told me I

18  still couldn't bring the drugs in the house.  When the

19  police was in the area again, I went in the house.  When

20  I came outside, to my surprise, someone had stole the

21  drugs.

22  Q.    Out of the trash can you testified to?

23  A.    Trash can.

24  Q.    About when was that?

25  A.    This was near the 14th, middle of October.

1   Q.    Okay.

2   A.    So then I -- she had got a job and started coming

3   home late.  So she gave me keys to her house so I can

4   come and go as I please.

5   Q.    Right.

6   A.    She always reiterated, Don't have no company in

7   my house when I'm not home, especially when I'm not

8   home.

9   Q.    Right.

10  A.    So during that time, maybe a couple -- during that

11  time period right there, that's also when I started

12  instructing Miss Crawford to bring -- or Nettie to bring

13  the drugs over to Faye's house.

14  Q.    Okay.

15  A.    Because --

16  Q.    Now, when you asked Linette to bring the drugs

17  over, how would you do that?

18  A.    Sometimes I would page her.

19  Q.    And when you paged her, what happened?  You would

20  page her phone?

21  A.    Yes.  I would page her phone.

22  Q.    Would she call you?  Or when she got the page, she

23  would know what that meant?

24  A.    No.  She wouldn't know where I wanted it dropped

25  off at.

Chambers - direct                                      6

1    Q.    All right.

2    A.    Or if I was going to pick it up or she had to drop

3    it off.

4    Q.    Okay.

5          So she would call you then?

6    A.    Yes.

7    Q.    At the number you left?

8    A.    Yes.  But sometimes she would just page me.

9    Q.    Okay.

10   A.    She'll page me also to see if I wanted it.

11   Q.    Okay.

12         And what would you tell her?

13   A.    I would tell her to meet me at a certain location

14   at a certain time.

15   Q.    Would you tell her what to bring with her, or

16   anything like that?

17   A.    I would always tell her to bring one of the --

18   just bring one of them joints, I used to call them.

19   Q.    Okay.

20   A.    Bring one of them joints.

21   Q.    Okay.

22         Go ahead.

23   A.    Okay.  And then after that, in the middle of

24   October, that's when I instructed Miss -- Nettie to bring

25   the drugs over to Miss -- not Miss Bullock, but I called

1    her Faye -- Faye's house.  And during that time period,

2    one time, she wasn't home.  She started coming home late.

3    So around the third week of October, I had some ladies

4    show me how to process the powder cocaine into the crack.

5    Q.    That was the first experience you had with the

6    crack cocaine, as far as cooking it?

7    A.    Yes, because I didn't know the process.

8    Q.    Okay.

9    A.    So I was trying to get somebody to show me.

10   Q.    So that would have been the third week in October,

11   is your best estimate?

12   A.    Yes.  My best estimate is the third week of

13   October.

14   Q.    And what was the quantity that they cooked up for

15   you that time?

16   A.    No more than an eight-ball.

17   Q.    And what does an eight-ball consist of?

18   A.    3.5 grams.

19   Q.    3.5 grams?

20   A.    Yes.

21   Q.    Which is like a -- I guess a fifth of an ounce or

22   something?

23   A.    An eighth of an ounce.

24   Q.    Exactly.  An eight-ball.  Excuse me.

25            All right.  So they did that.  And I think

Chambers - direct                     8

1    you testified earlier, yesterday, that you sold those

2    drugs?

3    A.    Yes.   I packaged them up and I think what the

4    expert from Pennsylvania called it C.D. bags.

5    Q.    All right.

6    A.    Yes.

7    Q.    And you sold those?

8    A.    Yes.

9    Q.    And how much did you make from that?

10   A.    You make around $150.

11   Q.    Okay.

12             Then sometime after that, another woman

13   showed you how to do it?

14   A.    Yes.   About four to five days later, another woman

15   showed me how to do it again, because I still wasn't

16   certain and I didn't want to risk losing no money.

17   Q.    Right.

18   A.    So another woman showed me the process again.

19   Q.    What was the quantity at that time?

20   A.    About an eight-ball.

21   Q.    You again did the same thing?

22   A.    Yes.

23   Q.    And what does that put us to as far as dates,

24   approximately, in your mind?

25   A.    We're still right around between the 21st and

1    maybe like the 26th.

2    Q.    Of October?

3    A.    Yes.

4    Q.    Okay.

5            And then, at some point thereafter you

6    started cooking cocaine yourself?

7    A.    Yes.

8    Q.    And when did that start?  When was the first time

9    you remember cooking crack cocaine?

10   A.    Late October.

11   Q.    Okay.

12           And that would have been at Faye's house?

13   A.    Yes.

14   Q.    And Faye was not there when you started to cook

15   it?

16   A.    No.

17   Q.    She came in on you as you were cooking it?

18   A.    I never -- I never like to cook the stuff around

19   the ladies.

20   Q.    Right.

21   A.    I will always do it when they wasn't there or when

22   Miss -- or when Nettie would like not be there or with

23   the kids.

24   Q.    All right.

25   A.    So that way, right there, I would -- because I

1   didn't like them around the stuff.

2   Q.   Well, my question to you, if you will listen to me,

3   is:  The first time that you cooked it, did Faye come in

4   on you?

5   A.   Oh, yes.

6   Q.   So she, like, caught you?

7   A.   You're talking about the time with the two ladies?

8   Q.   Is that when she caught you?  With the two ladies?

9   A.   Yes.  She caught me both times.

10  Q.   Okay.

11          And then after that you cooked it on your

12  own?

13  A.   Yes.

14  Q.   What was the quantity you cooked the first time

15  you tried it on your own?

16  A.   A quarter.

17  Q.   That's a quarter of a what?

18  A.   Ounce.

19  Q.   Which is how many grams?

20  A.   7.

21  Q.   7 grams?

22  A.   7 grams.

23  Q.   And you explained to the Court yesterday, and I

24  want you to do it again, what was the percentages?  How

25  did you mix it?  7 grams of powder?  And how much of

1   bicarbonate of soda?

2   A.    Oh, 7 grams.

3   Q.    So that made 14 grams?

4   A.    Yes.

5   Q.    And then how do you do it?  What do you do then?

6   A.    You put water in a mixing bowl.

7   Q.    Right.

8   A.    You add flame to it.

9   Q.    Right.

10  A.    And once it boils, you take it off and then you

11  cool

12  it --

13  Q.    Right.

14  A.    -- with ice or cold water.

15  Q.    Right.

16  A.    Then you wait and you stir it.  As you stir it, it

17  usually come out right.  If it's real good cocaine, it

18  will come back in like one ball.  If not, you've got to

19  like pour it out and then let it dry.

20  Q.    And what is that cooked down to?  What weight?

21  A.    Like I said, it depends on the purity, but majority

22  of the time, around 6 grams.

23  Q.    So 7 grams of powder and 7 grams of sodium

24  bicarbonate or bicarbonate of soda would cook down to 6

25  grams of crack?

Chambers - direct                    12

1   A.    Yes.

2   Q.    Okay.

3              And how often would you cook these quarters

4   that you are referring to?

5   A.    I cooked them, at the majority, around two times.

6   Q.    Two times a week, you mean?

7   A.    How many times did I cook a quarter?

8   Q.    Well, okay.  Let's back up.

9              You cooked a quarter this one time?

10  A.    Yes.

11  Q.    In late October, was it, or early November?

12  A.    It's late October.

13  Q.    Okay.

14              Then tell us the next time.

15  A.    Early November.

16  Q.    You cooked another quarter?

17  A.    Yes.

18  Q.    And go ahead from there.

19  A.    Then --

20  Q.    Let me stop you.  I'm sorry.

21              What would a quarter or 7 -- 6 grams of crack

22  break down into?  That would be these -- this package

23  that is the Government's exhibit?

24  A.    Yes.

25  Q.    Which is -- how many rocks, I guess, is the

Chambers - direct                    13

1   question?

2   A.    You can get almost like 40.

3   Q.    Okay.

4         So you would sell those 40 rocks for how much

5   apiece?

6   A.    Ten -- they're $10 pieces.

7   Q.    Okay.

8         So 6 grams of crack would be equal to about

9   $400?

10  A.    Well, you've got to take shorts, because it's

11  competition out there.  So sometimes you've got to take

12  three for 20 or seven for $50.

13  Q.    Okay.  I see.

14        So you're bargaining, in other words?

15  A.    Yes.

16  Q.    How much crack would you sell in a particular

17  night?

18  A.    Well, like I said, I primarily sold cocaine.

19  Q.    Primarily sold the powder?

20  A.    Yes.  So it took off kind of slow, so I wasn't --

21  I can't give you an estimate, because the business

22  wasn't even good at first for me.

23  Q.    Okay.

24        So you would cook 7 grams of a powder down

25  to crack.  And approximately when would be the next time

1    you would cook up again?

2    A.    Probably a week later.

3    Q.    Okay.

4          And was Faye there when that happened?

5    A.    I can't recall.

6    Q.    Okay.

7          Is it possible that she could have been

8    there?

9    A.    It's possible.

10   Q.    On occasion, when it happened?

11   A.    Yes.

12   Q.    And how about Linette?

13   A.    Yes.

14   Q.    Okay.

15   A.    She could have been there.  They could have walked

16   in while I was doing it.

17   Q.    Linette has testified pretty consistently that she

18   was there twice when you cooked up powder cocaine to

19   crack.  Do you remember her being there on two occasions

20   when that happened?

21   A.    I remember -- I definitely remember the time when

22   she said, It gives me a headache.

23   Q.    And she left?

24   A.    And she ran out the house, yes.

25   Q.    And she could have been there one other time.  Is

1  that possible?

2  A.    Yes.

3  Q.    Were there times when Linette was present at Faye's

4  house when drugs weren't cooked -- when cocaine wasn't

5  cooked down to crack?

6  A.    Oh, on many occasions.

7  Q.    How often would Linette be at the house, at Faye's

8  house, when you were selling the powder drugs from the

9  back porch?

10  A.    The majority of the time.

11  Q.    She would just spend the night?  I mean, when I

12  say spend the night, be there for a few hours?

13  A.    Yes, she would be there for a few hours, because

14  Miss Bullock goes to bed early.  She goes to bed early.

15  Q.    Ms. Bullock?  You mean Faye?

16  A.    Faye.  Faye goes to bed early.  And Nettie don't

17  like to keep her kids out like, past, 8:30.

18  Q.    So what would happen then?

19  A.    Sometimes I would -- I would lock up, too, because

20  I was taking care of my son at the time.

21  Q.    Right.

22  A.    His mother was studying for the C.P.A. exam.

23  Q.    Okay.

24  A.    So I was the real caretaker of the family.

25  Q.    Okay.

1    A.    Of my son at the time.

2    Q.    And how often -- from this period from September,

3    when you started at Faye's house, up through December,

4    those nights that you were working, and those nights that

5    Linette brought you the drugs, how often would Linette

6    take the bag of drugs back to her house as opposed to

7    you dropping them off, approximately?

8    A.    About 50 percent of the time.

9    Q.    So around half that time?

10   A.    Yes.

11   Q.    Okay.

12          Now, Faye has testified under oath that she

13   observed you cooking crack at least, I think it was three

14   or four times a week.  Is that possible?  Is that true?

15   A.    No, it's not possible.  Two, at the most.

16   Q.    A week?

17   A.    Yes.

18   Q.    Okay.

19          So it is possible that she would have seen

20   you cook crack twice a week?

21   A.    Yes.  During the early stages.

22   Q.    And how about in the latter stages?

23   A.    No, because I started cooking larger quantities

24   so I could spread the time out a little further.

25   Q.    Okay.

1           So, now, when did that start to happen, the

2    larger quantities?

3    A.    A couple weeks prior to me getting shot.

4    Q.    So some time in early November?

5    A.    No.

6    Q.    Oh?

7    A.    Maybe the second week.

8    Q.    Second week of November?

9    A.    Yes.

10   Q.    And what did you cook up that time?

11   A.    A half-ounce, which is 14 grams.

12   Q.    Okay.

13           What is the most quantity you ever cooked up

14   at one time?

15   A.    An ounce.

16   Q.    Which is 28 grams?

17   A.    Yes.

18   Q.    So you cooked up a half an ounce, which is 14

19   grams, you remember, a couple weeks before you were shot?

20   A.    Yes.

21   Q.    And how often did you do that?

22   A.    I think I did it the next week.

23   Q.    So you did it -- you took -- you cooked 14 grams?

24   A.    Yes.

25   Q.    One time?

Chambers - direct                18

1   A.    Yes.

2   Q.    And that cooked down to how many grams,

3   approximately?

4   A.    Between 12 and 13.

5   Q.    And that 12 or 13 grams of crack broke down into

6   how many rocks?

7   A.    Maybe 40.

8   Q.    Well, you just said the 6 grams were 40.

9   A.    40 -- well, you mean you make 400 off of it.  You

10  make 400 off of it.

11  Q.    Let me back up for a minute.  I thought you

12  testified earlier that when you cooked 7 grams of powder

13  down to crack, you got 6 grams.  I asked you how many

14  rocks --

15  A.    That's right.  I'm sorry.  I'm sorry.  I'm sorry.

16  I'm sorry.  You do get 80.  You get 80 and you make $600.

17  Q.    Are you sure?

18  A.    Yes, I'm sure.  I'm positive.  I'm just confused

19  about the numbers.

20  Q.    Take your time, because this is important.

21  A.    Okay.

22  Q.    You need to be honest and truthful about this and,

23  you know, be as positive about what you are testifying

24  to as possible.

25  A.    Okay.

Chambers - direct                          19

1    Q.    Don't just say things.

2    A.    Okay.

3    Q.    So this about it; all right?

4    A.    Yes.

5    Q.    Now, you cook a half-ounce?

6    A.    Yes.

7    Q.    Now, tell us how you do that.

8    A.    I do it the same way I do it with the smaller

9    weights.

10   Q.    Well, tell us.

11   A.    I put it in the mixing bowl.  I add water, baking

12   soda.

13   Q.    How much baking soda?

14   A.    14.

15   Q.    14 to 14?

16   A.    Yes.

17   Q.    And how long does it take to cook down?

18   A.    If I'm in a rush, five minutes.

19   Q.    So the quantity that you are cooking really

20   doesn't dictate how long it takes to cook it?

21   A.    No.

22   Q.    And you can cook an ounce the same period of time

23   that you can cook an eight-ball?

24   A.    If you are in a rush.

25   Q.    That's what I mean, if you are in a rush?

Chambers - direct                    20

1  A.    Yes.

2  Q.    So now you are saying sometime in the middle of

3  November, you cooked a half an ounce?

4  A.    Yes.

5  Q.    Which is 14 grams.

6             And how long would it take you to sell that?

7  A.    About a week.

8  Q.    About a week?

9  A.    About a week.

10  Q.    Did you ever deal any weight?

11  A.    No.

12  Q.    As far as crack?

13  A.    No, sir.

14  Q.    Basically, it was street level dealing?

15  A.    Yes, because the most people would come to me would

16  be like $50 or $100 and I will give them, like, 14 for a

17  hundred or 7 for 50.

18  Q.    That's 7 rocks?

19  A.    Yes.

20  Q.    Now, you cook up 7 -- 14 grams down to 12, we'll

21  say.  This is your figure.  You sell some of it that

22  night.  Now, when -- you're closed for business.  What do

23  you do with what's left over, the powder and the crack?

24  A.    I -- if I've got a little what you name left over --

25  Q.    What's what you name?

1   A.    If I've got the crack left over, I will wrap it up

2   in a little ball by itself.

3   Q.    In the tape again?  The gray tape?

4   A.    Yes.  Duct tape.  I will take the powder and wrap

5   it by itself.

6   Q.    What would you do with the duct tape?

7   A.    But I also might have, like, bags, like the little

8   bags.

9   Q.    What does that mean?  I don't know what bags mean.

10  A.    Like the bags that you put the cocaine in.

11  Q.    Are you talking about the powder or the crack?

12  A.    The little powder bags, because you dip the powder.

13  So I might have the little powder -- a bag about this

14  long (indicating).  About this wide (indicating).

15  Q.    Right.

16  A.    I will wrap them separately, too.

17  Q.    Okay.

18  A.    I will wrap them separately so I know.

19  Q.    Okay.

20            What would you do with those drugs?

21  A.    Take them to Linette's house.

22  Q.    What would you take them in?  What container?

23  A.    A black book bag.

24  Q.    And if she was there, what would you do?  If she

25  was at Faye's house, what would you do?

Chambers - direct                        22

1   A.    I would let her take them with her.

2   Q.    How many times, if you can remember, did you cook

3   up crack cocaine before you were shot?  I'm sorry.  Let

4   me rephrase that.

5             How many times did you cook up the half-ounce

6   of crack cocaine before you were shot?

7   A.    Around two.  Twice.

8   Q.    Twice?

9   A.    Yes.

10  Q.    When were you shot?

11  A.    The exact date?

12  Q.    Yes.

13  A.    I don't know the exact date.

14  Q.    You don't remember the day you were shot?

15  A.    No.

16  Q.    Not that important?

17            How close was it in relation to Thanksgiving?

18  A.    Very close.

19  Q.    I mean --

20  A.    About a week.

21  Q.    A week before or after?

22  A.    A week before.

23  Q.    All right.

24            So you were laid up over Thanksgiving?

25  A.    Yes.

Chambers - direct                    23

1   Q.    So you were not working by selling drugs around

2   Thanksgiving?

3   A.    No.

4   Q.    And you did not work until sometime after -- about

5   a week after Thanksgiving?

6   A.    That's correct.

7   Q.    Presuming Thanksgiving is, I think, the third

8   Thursday of the month, sometime after that would have

9   been the very end of November or the beginning of

10  December.

11  A.    Yes.

12  Q.    Do you remember when you started up again?

13  A.    It was in November.  Late November.  The last

14  couple days of November.

15  Q.    Okay.

16         And how did you start up again?  By that I

17  mean, what did you do, specifically?

18  A.    I instructed Miss Crawford -- well, Linette to

19  bring the drugs over to Faye's house.

20  Q.    Right.

21         You went back to Faye's house?

22  A.    Yes.

23  Q.    All right.  And what happened?

24  A.    She brought it over.  I cooked an ounce.

25  Q.    You cooked an ounce at that time?

Chambers - direct                    24

1    A.    Yes.

2    Q.    And that would have been 28 grams?

3    A.    Yes.

4    Q.    Okay.

5             And that cooked down to what amount, about?

6    A.    Between 24 -- 24 grams.

7    Q.    About 24?

8             And you packaged it?

9    A.    Yes.

10   Q.    And then you started selling it again?

11            Now, did people know you were open for

12   business?

13   A.    No, but people were looking for me, people were

14   knocking on her door.

15   Q.    So at some point afterwards, you cooked up some

16   more crack?

17   A.    Yes.

18   Q.    When was that?

19   A.    The last day, December the 8th.

20   Q.    So the day you got arrested?

21   A.    Yes.

22   Q.    You cooked up crack that night?

23   A.    Yes.

24   Q.    How much did you cook that night?

25   A.    An ounce.

1   Q.    Which is 28 grams?

2   A.    Yes.

3   Q.    And what did that cook down to?

4   A.    That cooked down to 24.

5   Q.    Now, when you were arrested, they found 30 grams

6   of crack cocaine, approximately.

7   A.    Yes.

8   Q.    How do you explain that?

9   A.    Because that week that I came back, I didn't sell

10  everything.  I didn't sell everything.  So I had some

11  carryover from that previous week.

12  Q.    About 6 grams?

13  A.    Yes.

14  Q.    How about the powder?  Explain how much powder

15  there was.   There was about 200 -- well, let me tell you

16  what there was, if I can find it.

17            (Pause.)

18  BY MR. BENSON:

19  Q.    I think there was 300 and some grams of powder

20  cocaine when you were arrested.  Do you remember that?

21  Do you remember how much it was that you had at Faye's

22  house when you were arrested?

23  A.    265?

24  Q.    This says 300 grams of cocaine was found in the

25  ceiling of the pantry.

1   A.    Does that say approximately?

2   Q.    Let me find it.

3              (Pause.)

4              MR. BENSON:  Do you have the lab report?

5              MR. PRETTYMAN:  It's an exhibit.  But I think

6   it was 265.9 grams.

7              THE WITNESS:  Yes.  Somewhere around there.

8   BY MR. BENSON:

9   Q.    So less than 300?

10  A.    Yes.

11  Q.    So you're right, I was wrong, which is a good sign.

12  Yes.  265.09 grams of powder cocaine.

13             How much is that in ounces?

14  A.    A little over 9.

15  Q.    9 ounces?

16  A.    Yes.

17  Q.    Which is a little over half a pound?

18  A.    No.

19  Q.    16 ounces in a pound?

20  A.    You said half a pound?

21  Q.    Yes.

22  A.    I'm thinking half a key.

23  Q.    No, no.

24  A.    You're right.  A quarter-key.

25  Q.    Yes.  It's a quarter-key.

1    A.    Yes.

2    Q.    Okay.

3              And how much -- how much of the powder had

4    you started out with?

5    A.    That night?

6    Q.    Well, that night, yes.

7    A.    I know I had one wrapped up as a quarter-key, but I

8    had some left over in a little small package also.

9    Q.    Okay.

10             And you had sold that?

11   A.    Well, I didn't sell all of it.

12   Q.    You had sold some of it?

13   A.    Yes.

14   Q.    And had you sold any crack that night?

15   A.    Yes.  I sold a couple bags.

16   Q.    What does bags mean?

17   A.    The little C.D.'s.

18   Q.    The $10 rocks or whatever?

19   A.    Yeah.

20   Q.    And how many of those do you remember selling?

21   A.    I can't -- I can't recall.

22   Q.    But were there a lot?

23   A.    I sold some.  I really can't tell you how much I

24   sold that night.  Sold that night.

25   Q.    Now, on May the 27th, you and I met with the agents

Chambers - direct                    28

1   and Mr. Prettyman.  Do you remember that?

2   A.     What was that date again?

3   Q.     May the 27th, I thought it was?

4   A.     Yes.   That was the proffer?

5   Q.     Yes.   And at that time there were discussions

6   about quantity of drugs --

7   A.     Yes.

8   Q.     -- that you might have been involved in.

9              Let me ask you to give your best estimate,

10  remembering that you are under oath --

11  A.     Yes.

12  Q.     -- as to the quantity of powder cocaine you

13  believe that you were involved in dealing from July, when

14  you first got involved with Linette, through September

15  and October and November with Faye, the amount of powder

16  cocaine that you believe that you were involved in in

17  dealing?

18  A.     Yes.

19  Q.     Can you tell us the quantity?

20  A.     Well, it's -- Mr. Sullivan and Mr. Prettyman asked

21  me to estimate how much powder that I sold.

22  Q.     All right.

23  A.     On a given week.

24  Q.     All right.

25  A.     And I informed it's about a key.

1    Q.    Okay.

2    A.    But I said that there's different months.  So they

3    said, like, In terms of months?

4            And I said, Well, it can be anywhere from

5    three to four.

6    Q.    Anywhere from three to four keys of powder --

7    A.    Yes.

8    Q.    -- in a given month.

9            And that would have started in September or

10   in August?

11   A.    It would have started in August.

12   Q.    Okay.

13           So it was in August, September, October and

14   November.  It would have been four months?

15   A.    Which is 16 weeks.

16   Q.    Which is 16 weeks.  Well, four months.  And you're

17   saying three to four keys a month?

18   A.    Yes.

19   Q.    Okay.

20           So it would have been anywhere from 12 to 16

21   keys of powder?

22   A.    Yes.  But I think I said somewhere between 15 and

23   20.

24   Q.    Okay.

25           Now, more importantly, this crack cocaine

1   business.  Can you give us your best estimate as to the

2   quantity of that that you were involved in, selling

3   either -- selling yourself or involved in cooking up?

4   A.    My best recollection would be the approximation

5   between three to 4 ounces.

6   Q.    Now, three to 4 ounces is how many grams?

7   A.    84 to, like, 112.

8   Q.    So you're talking about the maximum you believe

9   would be about 112 grams?

10  A.    Yes.

11  Q.    And that's including these eight-balls, which are

12  three-point-something grams?

13  A.    Yes.

14  Q.    The quarter?

15  A.    7 grams.

16  Q.    Which is 7 grams, quarter-ounce.  And then you

17  cooked on two occasions, you remember specifically, one

18  ounce, which would be 28 grams.

19          Now, when you're saying 28 grams, that cooks

20  down to less than the 28 grams.  So that would be 24?

21  A.    Yes.

22  Q.    Approximately?

23  A.    Yes.  I was using like the amount of cooked up.

24  Q.    Okay.

25          So you're saying 28?

Chambers - direct                        31

1   A.      Because it's powder.

2   Q.      Right.

3   A.      Yes.

4   Q.      Okay.

5            Now, is there any doubt in your mind about

6   those numbers that you are talking about?  Do you believe

7   that to be truthful and honest?

8   A.      Yes.

9   Q.      And, again, I ask you:  At any time did you ever

10  deal any other crack cocaine other than what you cooked

11  up yourself or what those two ladies cooked up on each

12  separate occasion?  Do you understand the question?

13  A.      What are you saying?

14  Q.      Basically, did you get any crack cocaine from

15  anyone else to sell?

16  A.      No, sir.  No, sir.  No, sir.

17  Q.      You're sure of that?

18  A.      Yes.

19  Q.      The firearms that were in Faye's house, who did

20  they belong to?

21  A.      They belonged to me, your Honor.  I mean -- sorry --

22  they belonged to me, Mr. Benson.

23  Q.      Okay.

24            You admit that?

25  A.      Yes.

1    Q.    You acknowledge that?

2    A.    Yes.

3    Q.    Do you accept the responsibility of having those

4    firearms?

5    A.    Yes, I do.

6    Q.    Now, where were they located?

7    A.    They were located in the -- how it's set up when

8    you first walk in, to your immediate right is a cabinet.

9    She has a lower cabinet and she has an upper cabinet.

10   Q.    All right.

11   A.    They were placed in the lower cabinet.

12   Q.    And were they wrapped or were they in a bag or

13   were they just laying there?

14   A.    I think they was in a black bag that the

15   prosecution have.

16   Q.    That black --

17   A.    Tote bag.

18   Q.    Tote bag?

19   A.    Yes.

20   Q.    All right.

21         And what was in the bag with the weapons?

22   A.    I can't really recall what was in the bag with

23   the weapons, but I know the scale was somewhere in the

24   proximity.

25   Q.    Were there any drugs in the bag with the weapons?

Chambers - direct                    33

1    A.    No, sir.

2    Q.    Are you sure of that?

3    A.    I'm positive of that.

4    Q.    Were there any drugs in the kitchen?

5    A.    Well, once you enter her kitchen, you go through

6    the pantry.  It's like a little pantry.

7    Q.    Listen to my question:  Were there any drugs in

8    the kitchen?

9    A.    There are no drugs in the kitchen.  They're in

10   the pantry.

11   Q.    My question is were there drugs in the kitchen?

12   A.    No, sir.

13   Q.    Were the weapons in the kitchen?

14   A.    Yes.

15   Q.    All right.

16         Where were drugs found?

17   A.    In the pantry.

18   Q.    All right.

19         And how many feet or yards or inches is the

20   pantry from the kitchen?

21   A.    Maybe 20.

22   Q.    So the drugs were found about 20 feet away from

23   where the weapons were found?

24   A.    Yes.

25   Q.    And then there were additional drugs found

1    elsewhere; is that right?

2    A.    Yes, sir.

3    Q.    And where were they?

4    A.    Outside over the overhang.

5    Q.    And how far would that be from where the drugs

6    were?

7    A.    From where the drugs were?

8    Q.    I mean from where the guns were?

9    A.    Maybe like 30 feet.

10   Q.    Okay.

11         And when you were arrested, you were

12   arrested upstairs; isn't that correct?

13   A.    That's correct.

14   Q.    And you had no drugs on you at the time?

15   A.    That's correct.

16   Q.    No weapons on you at the time?

17   A.    That's also correct.

18   Q.    And you've accepted the responsibility by

19   admitting your involvement in this illegal activity;

20   isn't that correct?

21   A.    Yes, sir.

22   Q.    The issue, and the only question before the Judge

23   at this point, is really the amount of drugs involved;

24   is that right?

25   A.    That's correct.

1    Q.    And you're saying, as I understand it, under oath,

2    that you believe the powder cocaine could have been

3    anywhere, I guess, from 12 to 20 keys over a period of

4    four months:  August, September, October, November.

5    Four months, approximately.  And no more than 4 ounces

6    of crack?

7    A.    Yes.  Between 3 to 4 ounces of crack.

8              MR. BENSON:  I have nothing further at this

9    point.

10             THE COURT:  All right.

11                    CROSS-EXAMINATION

12   BY MR. PRETTYMAN:

13   Q.    Good morning, Mr. Prettyman.

14   A.    Good morning, Mr. Prettyman.  How are you doing

15   today?

16   Q.    Okay.  How are you?

17   A.    I'm doing great.

18   Q.    I want to give you the same warning that I gave

19   Faye Bullock, Linette Crawford.  Sometimes I talk too

20   fast.  If I say something too fast or if I start talking

21   so fast that the words run together, just ask me to

22   please slow down or to repeat it or rephrase it, please.

23   A.    Yes.

24   Q.    You just told Mr. Benson that the two guns, the

25   two firearms that Detective Sullivan showed the Court

1   yesterday and that were admitted into evidence are your

2   guns; is that correct?

3   A.    Yes, I did.

4   Q.    And that -- is it also true that you used those

5   guns to protect yourself, the drugs and the proceeds from

6   the sale of the drugs, and that's why you had the guns at

7   Faye's house?

8   A.    No, because the guns wasn't usually at Faye's house.

9   Q.    That night?

10  A.    That night I had them because I was going to get them

11  cleaned.

12  Q.    Okay.

13            Were you using those?  Because you told Mr.

14  Benson that you accepted responsibility for the guns.

15  A.    I do accept responsibility for the guns, as far as

16  me having them in my possession.

17  Q.    And you had the guns loaded at the time that they

18  were seized; correct?

19  A.    Yes.

20  Q.    And the guns were in easy access or reach to you

21  from where the scale was, where the drugs inside her

22  residence were, and also a mere 30 feet from the step

23  where you were selling the crack cocaine; is that

24  correct?

25  A.    When you say the mere -- like -- can I like get to

1    them within seconds, or?

2    Q.    Were they in ready access, so that if somebody was

3    coming to rip you off, to assault you, to try to shoot

4    you again, would you have had access to those weapons

5    from where you were when you were selling the drugs and

6    from where the drugs were in the pantry area?

7    A.    I know there was other stuff in the bags, so I know

8    I could go through other stuff to get it, but I don't

9    think it would have been too much of a problem.

10   Q.    So it was available to you if you needed it?

11   A.    Yes.

12   Q.    Both those guns were; correct?

13   A.    Yes.

14   Q.    And they were loaded and ready to go?  In other

15   words, ready to be fired, as Detective Sullivan testified?

16   A.    I can't recall, but it's possible.  It's possible

17   they were loaded.

18   Q.    And the scale was in the same bag or the same

19   cabinet as the drugs; is that correct?

20   A.    No.

21   Q.    Your scale?

22   A.    No.  No.  The scale was in the same cabinet as the

23   bag -- I mean as the guns.

24   Q.    The scale -- I thought that's what I said.

25   A.    You said the drugs, I think.

Chambers - cross                    38

1    Q.    Okay.

2                The scale was in the same bag as the guns?

3    A.    Not in the same bag.  In the same area.

4    Q.    The same cabinet?

5    A.    Yeah.  Same cabinet.

6    Q.    Within a foot or so of the -- the scale was within

7    a foot or so --

8    A.    Inches.  Inches.

9    Q.    Within inches of the firearms?

10   A.    Yes.

11   Q.    And that's the scale that you used to weigh up

12   cocaine or crack cocaine that you received or that you

13   would receive or that you would package for sale?

14   Either way?

15   A.    I -- the big scale I used for powder.

16   Q.    Okay.

17                But the scale that was near the gun, you

18   used that as part of your drug business; is that correct?

19   A.    Yes, that's correct.

20   Q.    And when the police came that night to arrest you

21   and to do the search warrant, you were in the business

22   of selling drugs outside Faye Bullock's residence?  The

23   crack cocaine that was in the overhang; is that correct?

24   A.    Yes.

25   Q.    And when they came, you ran into her house; is

1    that correct?

2    A.    Right.

3    Q.    Now, Mr. Benson asked you about August, September,

4    October, November, when you were trying to figure out the

5    3 to 4 kilograms of cocaine that you were getting per

6    month.  But you also got -- there's a week in December

7    that you got a kilogram of cocaine, too; isn't that

8    correct?

9    A.    Yes.

10   Q.    So when you are giving him the estimates between

11   August, September, October and November of 3 to 4

12   kilograms and you're multiplying it by four months,

13   you're not adding the week of December 1st through 8th;

14   correct?

15   A.    Yes.

16   Q.    During the week or two that you were laid up from

17   being shot in November of 1997, did anybody bring you

18   cocaine or any other drug for you to hold, store, sell

19   or deliver?

20   A.    I used to periodically check on Miss Crawford, to

21   make sure that, you know, that she didn't give them to

22   nobody and check on it to make sure they was still there.

23   Q.    So during that time period, she would bring over

24   the bags --

25   A.    Yes.

1   Q.    -- of cocaine or crack, whatever was packaged?

2   A.    Whatever was packaged, yes.

3   Q.    And what did you do with that?  Did you sell it to

4   anybody else?

5   A.    No.  I would just hold it.

6   Q.    Now, I want to talk to you for a little bit, a

7   question or two, about the summer of 1997 to December 8th

8   of 1997, just for a question or two.  And then I'm going

9   to talk about some other things.  And I'm always going to

10  try to preface it with the time period.

11  A.    Yes.

12  Q.    So if there's a question, please ask me what time

13  period --

14  A.    Yes.

15  Q.    -- we're talking about so we're all on the same page.

16        I'm not sure that the Judge is familiar with

17  Riverside.  2602 Bowers Street, which is where Faye

18  Bullock lived during that time period --

19  A.    Yes.

20  Q.    -- is in the Riverside --

21  A.    Project.

22  Q.    -- neighborhood of Wilmington, Delaware?

23  A.    Yes.

24  Q.    It's like a neighborhood like other neighborhoods;

25  correct?

1    A.    That's correct.

2    Q.    And that's where you would sell your drugs, the

3    cocaine and later the cocaine and the crack, out in the

4    Riverside area of Wilmington, Delaware, in the summer

5    and -- to December 8th, 1997; is that correct?

6    A.    Yes.

7    Q.    During this time period that I'm talking about,

8    summer of 1997 to December 8th of 1997, was there more

9    money to be made in Riverside, Wilmington, Delaware,

10   from selling cocaine or crack cocaine?

11   A.    Ask me that question again.

12   Q.    During the time period, summer of 1997 to December

13   8th of 1997, in Riverside, Wilmington, Delaware --

14   A.    Yes?

15   Q.    -- could you make more money selling cocaine or

16   crack cocaine?

17   A.    Well, it varies, because during the summer months,

18   people like to cook their own stuff up.  So you sell

19   powder.

20             But during the winter months, people like to

21   get their things quick, because a lot of people smoke

22   outside, so they like to get their stuff quick.  So it

23   depends on the season.

24   Q.    Okay.

25             So would it be fair to say that during the

1    summer, when it's hotter, that more cocaine is sold in

2    Riverside?

3    A.    Yes.

4    Q.    And in the fall, in the winter, it's more crack

5    cocaine?

6    A.    You could say from the summer to the fall, to late

7    fall, it's better to sell powder.

8    Q.    And in terms of the actual sales that are being

9    done there, at -- from being out there, hanging out in

10   that area, are you familiar with the fact that there

11   are a large quantity of crack cocaine sales being made,

12   even during the summer up to December 8th of 1997 in

13   Riverside?

14   A.    I haven't personally taken any, so I can't really --

15   Q.    From what you have seen?

16   A.    Well, I really don't bother nobody's business,

17   because that can prove fatal.

18   Q.    Why don't you tell us about how you got shot?

19   A.    I got shot --

20            MR. BENSON:  Your Honor, I'm going to object

21   to this, to the relevance.

22            MR. PRETTYMAN:  It came out in the direct part

23   of the examination that he got shot.

24            THE WITNESS:  In the crossfire.

25            MR. PRETTYMAN:  In the crossfire.

1          THE COURT:  Well, what is it going to end up

2   being relevant to?

3          MR. PRETTYMAN:  Well, your Honor, depending

4   on how he got injured and the way in which he got injured

5   and the extent of his injury, it goes to the truthfulness

6   of whether during the two weeks he was laid off from work,

7   of selling drugs.

8          MR. BENSON:  Well, certainly how he got shot --

9   I'm sorry.  I apologize.

10         THE COURT:  I was going to say, physically it

11  may not be as significant as to what the injury was.  I

12  think you are really going to whether he was out of

13  action for two weeks; right?  Why don't you circle back

14  and get to that subject?

15         MR. PRETTYMAN:  Yes, your Honor.

16  BY MR. PRETTYMAN:

17  Q.    You were treated and released for that shot;

18  correct?

19  A.    Yes.

20  Q.    And during the time that you were treated and

21  released -- well, where was the injury?  What part of

22  your body?

23  A.    Right here, in my lower -- the right part of my

24  back (indicating).

25  Q.    Were you able, after you were shot, to walk away

1  from where you got shot?

2  A.    Yes.

3  Q.    And actually you didn't realize right away that you

4  had been shot?

5  A.    No.  I realized immediately I got shot, because I

6  got shot before.

7  Q.    Okay.

8          So is that also what you told the sergeant

9  who took your statement when you were at the hospital?

10  A.    What?  I was shot before?

11  Q.    No.  That you realized right away that you had been

12  shot?

13  A.    Yes.

14  Q.    And when you went to the hospital, did you go by

15  ambulance?  How did you get to the hospital?

16  A.    Nicole took me.

17  Q.    That's your girlfriend?

18  A.    Yes.

19  Q.    Mother of your child?

20  A.    Yes.

21  Q.    Your fiancee?

22  A.    Yes.

23  Q.    So you went, from the place where you got shot,

24  2600 block of Bowers Street, correct?  To Nicole Helms'

25  residence?  How far away is that?

Chambers - cross                45

1   A.    Maybe two blocks.

2   Q.    After you got shot, you walked two blocks?

3   A.    I ran two blocks, because I got shot in the lower

4   part of my back.  It's a dangerous area to get shot.

5   Q.    You could still move?

6   A.    Yes.

7   Q.    She takes you to the hospital.  Did they take the

8   bullet out?

9   A.    No.

10  Q.    Is the bullet still in now?

11  A.    No.

12  Q.    Okay.  But you were treated that night and then

13  released?

14  A.    Yes.

15  Q.    And then you went home?

16  A.    Yes.

17  Q.    During the time period, were you able to walk?

18  A.    Yes.

19  Q.    Were you able to talk?

20  A.    Oh, yes.

21  Q.    Were you able to -- you told us how to cook cocaine

22  and crack cocaine and it takes five minutes if you're fast,

23  maybe 15 if you are slow?  You were able to cook crack

24  cocaine with that injury?

25  A.    Yes.

1    Q.    It's physically possible for you to do that?

2    A.    Yes.  It's physically possible.

3    Q.    It's physically possible for you to package cocaine

4    and give cocaine to people to sell?

5    A.    It's possible.

6    Q.    Is it possible for you to stand on steps and deal

7    with people?  Sit on steps?

8    A.    It's possible.

9    Q.    And cocaine back and forth?

10            In 1997, when did you return to Delaware from

11   college?

12   A.    Late June.

13   Q.    Okay.

14            And during the time that you returned in late

15   June, maybe -- I'm going to try to ask you to be a little

16   bit more specific.  Summer I think begins June 21st.  Do

17   you remember whether it was before or after the beginning

18   of summer?

19   A.    Maybe right around that date.

20   Q.    Okay.

21            You know when Memorial Day is; correct?

22   A.    When is Memorial Day?

23   Q.    Memorial Day is the end of May, which is usually

24   when schools let out.

25   A.    See, I don't pay attention to holidays, because

1   it's not allowed in my religion.

2   Q.    Okay.

3            But it's a day when there would be no school,

4   no work.  Hercules would be off.  That's where Nicole

5   works, so you wouldn't have to watch your son, because

6   she would be off, too?

7   A.    Yes.

8   Q.    Do you remember that weekend?  It's a long weekend?

9   A.    No.  I was in California during that weekend.

10  Q.    And you came back to Delaware some time in June?

11  A.    Yes.

12  Q.    You think now with me telling you June 21st, it's

13  the beginning of summer officially, it was around that

14  date?

15  A.    Yes.

16  Q.    Now, when you came back, were you working?

17  A.    Yes.

18  Q.    Where were you working at?

19  A.    I was working for the Women's Youth Tennis

20  Association with Coach Jean Thompson, Lincoln University.

21  Q.    So during the day you'd be working?  Was that a

22  day shift?

23  A.    That's -- yes.  It's a day shift.

24  Q.    Okay.

25  A.    From 8:00 to 4:30.

1    Q.    Okay.

2              And you testified, I believe, either today or

3    yesterday in direct examination, that you like to do your

4    drug selling at night; is that correct?

5    A.    That's correct.

6    Q.    And you did that to avoid detection from police;

7    correct?

8    A.    I think whenever you sell drugs, you do it to

9    avoid detection of police.

10   Q.    And that's also when business would be brisk, too;

11   correct?  People would come to buy?

12   A.    Well, business is brisk, I think, now all the time

13   in the city.

14   Q.    Okay.

15             And your purpose in selling drugs -- the

16   cocaine and later the crack cocaine -- was to make money;

17   correct?

18   A.    Yes.

19   Q.    And that was the sole purpose?

20   A.    The sole purpose was to help my family and the

21   people involved.

22   Q.    And to make -- and you did that by making money?

23   I mean --

24   A.    Yes.  The ultimate goal.

25   Q.    Now, when you returned in late June of 1997 to

1   Delaware, you were involved in the selling of cocaine at

2   that time; correct?

3                   MR. BENSON:  Your Honor, I'm going to object.

4   It seems to me that the focus of the cross-examination

5   should be during the period --

6                   THE COURT:  Well, let's just ask about what

7   relevance it has.

8                   MR. PRETTYMAN:  Your Honor, a case that your

9   Honor decided that went to the Third Circuit, United

10  States versus Wilson, 106 F. 3d 1140, Third Circuit, 1997,

11  talked about the relevant conduct involved, and that was

12  actually a drug and gun situation.  And they were talking

13  about the relevant conduct.  They said that offenses that

14  preceded the offense of conviction by as much as 17 months

15  that were similar could be considered relevant conduct.

16                  Well, what we're talking about here is how

17  much drugs to attribute to the defendant for sentencing,

18  so that, at the very least, up to 17 months before --

19                  THE COURT:  All right.  I will allow it.

20                  MR. BENSON:  Am I allowed to see that case

21  that he's referring to, because I don't have that in front

22  of me.  And since he hasn't provided me a copy of it, I

23  don't know that it is -- that his representation of the

24  case is as accurate as he would like --

25                  THE COURT:  Do you have an extra copy?

1              MR. PRETTYMAN:  Your Honor, actually, all I

2    have is the cite and a quote.

3              THE COURT:  What's the cite?

4              MR. PRETTYMAN:  106 F. 3d 1140.  And the

5    relevant pages that I was talking about were Pages 1143

6    to 1144.

7              THE COURT:  I will get you a copy.

8              MR. BENSON:  May I be heard on this, your

9    Honor, or not?

10             THE COURT:  Yes.  Go ahead.

11             MR. BENSON:  Okay.

12             Number one, I understand about relevant

13   conduct.  I understand about the history of the drug

14   involvement.  But I was under the impression that it

15   would have to be restricted to the period of time of

16   the alleged conspiracy.

17             I mean, to be honest with you, Mr. Chambers

18   has a prior drug conviction, I think five or six years

19   preceding.  Now, is that certainly relevant conduct for

20   purposes of sentencing?  I would think not.

21             So I don't know where this goes.  I don't

22   know how your case focused on that.  I don't know what

23   that gentleman pled guilty to.

24             I mean, I understand about relevant conduct.

25   I understand that what he did in July, even though he

1   didn't plead to that, is important for your Honor's

2   consideration.  But I'm just not sure how far back

3   you're entitled to go, since this conspiracy was between

4   July and his relationship with Linette Crawford and then

5   September, when he developed a relationship with Faye

6   Bullock.

7           THE COURT:  All right.  Well, do you want to

8   articulate what theory you're going to end up arguing at

9   the end?

10          MR. PRETTYMAN:  Yes, your Honor.  If it

11  involves the defendant's possession with intent to

12  distribute cocaine, which is what this is all about, and

13  it involves the Riverside area of Delaware, which is

14  where he was selling in connection with the conspiracy,

15  then I believe that based upon the Wilson case and there

16  are some other cases that involve -- United States versus

17  Richards, which is at 27 F. 3d 465.  Page 468 and 469,

18  the Tenth Circuit allowed as relevant conduct weekly

19  heroin sales 17 months before the drug offense of

20  conviction.

21          If it involves the same drugs, the same

22  general area, the same type of conduct, then I believe

23  that it passes the relevant conduct standard under 1B1.3

24  and, as the Court ruled in Wilson, that it's

25  sufficiently regular, similar and close enough in time

1    to be considered relevant conduct.

2                The only question I asked so far is about

3    June 21st to -- I asked about June 21st, 1997.  My

4    recollection of the indictment is it was on or about

5    July.

6                So I think that in the on or about period,

7    it would be relevant, if nothing else.  But more so, for

8    relevant conduct purposes under the Wilson case and the

9    Richards case that I talked about, I believe it would

10   be relevant conduct.

11               MR. BENSON:  Of course, I don't have either

12   one of those cases and he hasn't provided me with those

13   cases.  So while his interpretation of Wilson and Rogers

14   or whatever may be his belief, it's not necessarily a

15   correct interpretation.

16               THE COURT:  All right.

17               Did you put Mr. Benson on notice you were

18   going to make this argument?

19               MR. PRETTYMAN:  No, your Honor.  Because I

20   have a fear now I broached in front of the defendant who

21   realizing the downside from admitting any of it, I think

22   the chances of me getting any admissions --

23               MR. BENSON:  Well, I object to that.  That's

24   not -- you know, he's suggesting he's going to lie.

25   That's not right.

1          THE COURT:  Wait, just a minute.  The answer

2    is no.  Okay.

3          In most situations I'd be inclined to take

4    the testimony and see what the legal significance of it

5    is later.  If you object to that, and there's a basis for

6    saying, Judge, there's only a limited waiver in terms of

7    what his testimony is going to be, we need to talk about

8    that and what the basis for that would be.

9          I can give you a copy of Wilson.  Do you want

10   a copy of the Richards one, too?

11         MR. BENSON:  If he's relying on it --

12         MR. PRETTYMAN:  27 F. 3d 465.  The relevant

13   pages were 468 to 469.

14         THE COURT:  All right.  I'm going to take a

15   break and you can think about this for a minute, or do

16   you know what your position is going to be?

17         MR. BENSON:  Well, my position is -- I mean,

18   whatever pleases your Honor, certainly.  I just don't

19   think it's relevant.  And I've objected to that line of

20   questioning.  And your Honor will do what you are going

21   to do, obviously.

22         THE COURT:  All right.  What time period are

23   you asking for?

24         MR. PRETTYMAN:  So far, your Honor, I've

25   asked -- since he came back, which would be June 21st,

1    1997.  And my intent, first, is to start with June 21st

2    to July, and then, depending on how the statements go

3    and how regular the drug-dealing is, is to go as far

4    back as it's similar, regular and temporally proximate.

5              THE COURT:  I'm inclined to allow him to do

6    that.  And if you want to break to consider that...

7              MR. BENSON:  Well, I don't know that I need

8    a break to consider it.  If you are going to allow it,

9    you're going to allow it.  I've objected to it and we'll

10   go from there, I guess, Judge.

11             THE COURT:  Okay.

12             MR. BENSON:  I don't think a break for me is

13   going to cause you to change your mind.

14             THE COURT:  No.  I just wanted to give you a

15   chance to -- okay.  I was supposed to be printing out

16   the case, but I've got another case coming in ahead of

17   it that just keeps going.

18             MR. BENSON:  Okay.  For the record, I

19   certainly am taking issue --

20             THE COURT:  Yes?

21             MR. BENSON:  -- the suggestion by Mr.

22   Prettyman that Mr. Chambers, because of the objection

23   I've made, now has an opportunity to think about it and

24   will lie in his response.  I think that's totally

25   inappropriate.  That's the impression I got from his

1    suggestion.

2              THE COURT:  I heard his lawyer's argument,

3    but that's okay.  Basically, what he was saying was he

4    didn't want to put you on notice, because he wanted to

5    explore it fresh with your client when he testified.

6              MR. BENSON:  I didn't think we practiced

7    law in Delaware like that.  But if that's the way it

8    happens, I didn't know.  It's called ambush, isn't it?

9              THE COURT:  Let's just go ahead.  And as

10   soon as these cases are printed out, I will get my Clerk

11   to give one to you.

12             MR. BENSON:  All right.  Thank you.

13             THE COURT:  All right.  Go ahead.

14             MR. PRETTYMAN:  May I proceed with the same

15   line?

16             THE COURT:  Sure.  That's fine.

17             MR. PRETTYMAN:  Thank you.

18   BY MR. PRETTYMAN:

19   Q.    Between June 21st, 1997 and when you started

20   dealing with Linette Crawford --

21   A.    Yes.

22   Q.    -- did you possess with intent to distribute drugs,

23   specifically cocaine, in Riverside, Wilmington, Delaware?

24   A.    I think it might have started in July, because the

25   first couple weeks I really spent, you know, reuniting

Chambers - cross                    56

1  myself with my family.

2  Q.    So you believe that in July 1997 --

3  A.    Yes.

4  Q.    -- you began possessing with intent to distribute

5  cocaine in Riverside --

6  A.    Yes.

7  Q.    -- Wilmington, Delaware?

8  A.    Yes.

9  Q.    To be sold there?

10  A.    Yes.

11  Q.    And how many weeks before you asked Linette Crawford

12  in July 1997 to hold, I think you said it was a quarter-

13  kilogram of cocaine?

14  A.    Yes.

15  Q.    When the police were out?  How many weeks before

16  that were you possessing with intent to distribute

17  cocaine that you were going to distribute in Riverside?

18  A.    Maybe three, Mr. Prettyman.  Maybe three.

19  Q.    And what quantity of cocaine would you get each

20  week to possess with intent to distribute in Riverside?

21  A.    You're talking about now -- now --

22  Q.    During that three-week period?

23  A.    Okay.  During that three-week period?  Well, I

24  was fresh.  I think I got like a half a key, because I

25  was just -- I was just home from college.

1    Q.    Okay.

2              So you come home from college and right up

3    to half a kilogram of cocaine?

4    A.    You mean did I --

5    Q.    That you received on one occasion?

6    A.    Yes.  I received.

7    Q.    You received to distribute on one occasion per week

8    in those three-week periods half a kilogram of cocaine?

9    You went week one, received, possess with intent to

10   distribute, half a kilogram of cocaine.  Week two,

11   received, possess with intent to distribute --

12   A.    Week two?

13   Q.    Of these three weeks.

14   A.    Yes.  I don't know if I sold like half a key the

15   whole time.  I don't know if I sold it in two weeks or

16   the next week I sold the half a key.

17   Q.    I thought I understood your testimony to be that

18   during that three-week period, each time you got half a

19   kilogram of cocaine.

20   A.    I thought you meant the first time that I got it.

21   Q.    Okay.

22              The first time during that three-week period,

23   you got a package which was a half-kilogram --

24   A.    Yes.

25   Q.    -- of cocaine?

1  A.    Yes.

2  Q.    It wasn't a rock, a gram?  It went from zero to

3  500 grams of cocaine?  You went right to 500 grams of

4  cocaine?

5  A.    Yeah.

6  Q.    And the second time during that two-week period --

7  excuse me -- three-week period -- did you also receive a

8  half-kilogram of cocaine to possess with intent to

9  distribute in Riverside?

10 A.    I think I had that right there all the way to the

11 end of the month.

12 Q.    So you got one-half kilogram of cocaine?

13 A.    Yes.

14 Q.    During the three-week period before you dealt with

15 Linette Crawford?

16 A.    Yes.

17 Q.    Now, during the time that you were dealing with

18 Linette Crawford, when did you receive that cocaine that

19 you had her hold the quarter-kilogram of?

20 A.    Beginning of the month.

21 Q.    And during this same time period that you were

22 selling the cocaine in Riverside, the three-week period

23 that I'm talking about --

24 A.    Yes.

25 Q.    -- were you selling it in the same general area --

1   in other words, the Riverside area of Wilmington,

2   Delaware -- as you were selling during the time period

3   of the conspiracy with Faye Bullock and Linette

4   Crawford?

5   A.    With Faye and Linette combined, I sold it by Faye's

6   house.  During the time period you're talking about, I

7   sold it around -- is that Jensen Drive, the horseshoe?

8   Jensen Drive, I believe.

9   Q.    What area of the city is that called?

10  A.    That's Riverside also.

11  Q.    What happens is whoever is going to read what she

12  types might not be familiar with where Jensen Drive is.

13  That's why I asked you that question.

14  A.    Yes.

15  Q.    In terms of the people that would come both in

16  the three-week period before you started dealing with

17  Linette Crawford and the people later, when you were

18  dealing with Linette Crawford and Faye Bullock, would

19  they be the same general people selling the same general

20  weights of cocaine?

21  A.    Well, the longer I was home, the more people

22  realized I was home.  So the people varied.

23  Q.    Some of the people would be the same, some of the

24  people would be different?

25  A.    Yes.

1    Q.    Is that correct?

2    A.    Yes.

3    Q.    And during that time period, it was cocaine that

4    you were selling?

5    A.    That's correct.

6    Q.    Is that correct?

7    A.    Yes.

8    Q.    And when you would be selling, you would be selling

9    it on a regular basis?

10   A.    Well, like I told you, I never sold on Sundays.

11   Q.    Okay.

12              When I say regular basis, that means

13   consistently, like four or five times a week?

14   A.    Yes.

15   Q.    Just like you would be selling when you were

16   dealing with Faye Bullock --

17   A.    Yes.

18   Q.    -- and Linette Crawford?

19   A.    Yes.

20   Q.    So the regularity didn't change of when you would

21   sell.  The cocaine was one of the same drugs that you

22   were selling when you were dealing with Faye Bullock and

23   Linette Crawford as when you were selling during that

24   three-week time period; is that correct?

25   A.    Can you say it again, please?

1    Q.    Yes.   That was a bad question.

2              The drug that you were dealing when you

3    were dealing with Faye and Linette Crawford, Faye Bullock

4    and Linette Crawford, one of those drugs was cocaine;

5    correct?

6    A.    Correct.

7    Q.    And the drug that you were dealing in the three-

8    week period before you started dealing with Linette

9    Crawford and Faye Bullock was also cocaine; correct?

10   A.    Yes.   You're talking about the three-week time

11   period?

12   Q.    Yes.

13   A.    Yes.

14   Q.    Now, you said that the people started knowing that

15   you were home?

16   A.    Yes.

17   Q.    Whenever you come home from break, for breaks or

18   for summers, would you sell cocaine in Riverside?

19   A.    No.

20   Q.    When, before July of 1997, was the last time that

21   you sold cocaine in Riverside?

22   A.    A year.   Years ago.

23   Q.    And what approximate time of the year was that?

24   A.    Last year.   Last -- the following summer.

25   Q.    Okay.

1              So when you came home from college for your
2    summer break in 1996, you also sold cocaine in
3    Riverside?
4    A.    Yes.
5    Q.    Wilmington, Delaware?
6    A.    Yes.  But not on large scales.  It wasn't large
7    scales.
8    Q.    Were you selling to the same general people in the
9    same general area in Riverside?
10   A.    Well, people get locked up and people change.
11   Q.    So some of the people would be the same and some of
12   the people would be different?
13   A.    Yes.
14   Q.    But it was still cocaine that you were selling;
15   correct?
16   A.    Yes.
17   Q.    And how regular -- how many times a week would you
18   sell cocaine in Riverside, Delaware in the summer 1996?
19   A.    I don't recall.  That's too far back.
20   Q.    Would you do it every day?  Every day but Sunday?
21   A.    No.  Like I said, I can't really recall that far
22   back.  I just know I just started this right up here this
23   year, not doing it on Sundays, so I don't know what days
24   I missed during that time period.
25   Q.    Did you do it regularly?  At least weekly during

Chambers - cross                          63

1    the summer of 1996?  Possess with intent to distribute

2    cocaine in Riverside?

3    A.    Yes.

4    Q.    How much cocaine per week would you get in the

5    summer of 1996 to distribute in Riverside, Wilmington,

6    Delaware?

7    A.    I was only --

8    Q.    You went right up to a half-kilogram of cocaine

9    in 1997, when you came back?

10   A.    Yes.

11   Q.    Did you receive that on consignment or on front or

12   did you pay for that in advance?

13   A.    I received all of my cocaine on consignment.

14   Q.    So somebody trusted you enough to give you a

15   half-kilogram of cocaine to sell as soon as you came

16   back from college after being away for months?

17   A.    Yes.

18   Q.    Correct?

19   A.    Yes.

20   Q.    And was that the same person or a different person

21   than the person you were dealing with in the summer of

22   1996?

23   A.    It could have been the same person.  It could have

24   been a different person.

25   Q.    You had multiple sources of cocaine --

Chambers - cross                              64

1   A.    Yes.

2   Q.    -- both during the time period of this conspiracy

3   and in the summer of 1996; is that correct?

4   A.    Yes.  Yes.

5   Q.    And during the summer of 1996, would you also

6   receive the cocaine on consignment?

7   A.    Yes.

8   Q.    And did that begin on or about the same time?  June

9   21st, 1996 and end when you went back to college at the

10  end of August of 1997?

11  A.    Yes.

12  Q.    And you do not remember any of the quantities of

13  cocaine that you received on consignment during the

14  summer of 1996?

15  A.    They varied.

16  Q.    Well, what was the smallest amount?

17  A.    Probably about an eighth of a key.

18  Q.    What was the largest amount?

19  A.    Probably about up to about a half.

20  Q.    Half a kilo?

21  A.    Yes.

22  Q.    Of cocaine?

23  A.    Yes.

24  Q.    And what was the average amount, if there was an

25  average amount?

 1   A.    I don't -- I don't -- I can't really recall, because

 2   it differed between the two extremes.

 3   Q.    But would it be safe to say and accurate to say

 4   that whenever you received on consignment in -- in the

 5   summer of 1996 to possess with intent to distribute

 6   cocaine in Riverside, that it was at least 1/8 of a

 7   kilogram of cocaine that you received on consignment?

 8   A.    Yes.

 9   Q.    What did you do with the proceeds, the money that

10   you made from selling the cocaine in summer of 1996?

11   A.    I went to school.

12   Q.    What did you do with the proceeds of the money that

13   you made from selling the cocaine and the crack cocaine

14   during the time period of the conspiracy?

15   A.    What conspiracy?

16   Q.    The conspiracy with Faye Bullock, Linette Crawford,

17   that was in the indictment in this case that you pled

18   guilty to?

19   A.    The majority of that money I lost.  People

20   stealing stuff from me, getting robbed.  So...

21   Q.    You used part of the summer of 1996 money to pay

22   your bills; correct?

23   A.    Yes.

24   Q.    I mean college?

25   A.    Yes.

Chambers - cross                        66

1   Q.     Did you also pay some for Nicole?

2   A.     Yes.

3   Q.     And your son?

4   A.     Yes.

5   Q.     And whatever living expenses that you had?

6   A.     Yes.

7   Q.     Did you also use some of the proceeds the same way

8   in the time period of the conspiracy?

9   A.     Yes.

10  Q.     So you said some of the money you lost.  What

11  happened to the rest of the money?

12  A.     The rest of the money, when I got locked up, I think

13  I had about $10,000, max.

14  Q.     Okay.

15         And where was that?

16  A.     Where was that?  It was scattered all about.  My

17  mother held a couple dollars for me.  Nicole held a

18  couple dollars.

19  Q.     Okay.  When you are saying a couple dollars out

20  of 10,000 -- a couple thousand can be a street term for

21  a percentage of.

22  A.     Yes.

23  Q.     Is that the way you were using that just now?

24  A.     What?

25  Q.     I want to make sure I understand what you said.

1    When you say a couple dollars, do you mean three dollars

2    or do you mean a percentage of the $10,000?

3    A.    A percentage.

4    Q.    I'm sorry.  I interrupted you.  You said your

5    mother and Nicole?

6    A.    Yes.

7    Q.    And was there somebody else?

8    A.    I was going to tell you that the night that I think

9    the Honorable Mary Pat Trostle, is that her name?  I

10   might not have pronounced it correctly.  But that night

11   was the last time that we got robbed and that took all

12   the money from Nicole.  So I had no money after that.

13   Q.    Now I want to talk to you about the time period

14   between July 1997 to on or about December 8th, 1997, when

15   you were dealing with first Linette Crawford and then

16   Linette Crawford and Faye Bullock.

17   A.    Yes.

18   Q.    Now, other than the fact that you were arrested

19   on December 8th, 1997, was that a normal or typical day

20   of you possessing with intent to distribute selling

21   drugs in the Riverside area?

22   A.    Can you ask that question again?

23   Q.    Other than the fact that you were arrested on

24   December 8th, 1997, was that a normal day for you of

25   possessing with intent to distribute and selling drugs

1   in Riverside?

2   A.    No, because I normally possess smaller amounts

3   than what I had that day.

4   Q.    Now, approximately how many times per week during

5   that time period would you possess with intent to

6   distribute cocaine and crack cocaine at Faye Bullock's

7   house in Wilmington, Delaware?

8   A.    Six.

9   Q.    Okay.

10            And when you received the drugs, either

11  Linette Crawford would bring them over after you paged

12  her.  Sometimes she would call you to see if you wanted

13  the drugs to be brought over or sometimes you would just

14  see her and tell her that you needed the drugs; is that

15  correct?

16  A.    Yes.

17  Q.    Now, approximately weekly since July of 1997 to

18  early August of 1997 to December 8th, 1997, with the

19  exception of two weeks you took off in November, when

20  you were shot, you would average a kilogram of cocaine a

21  week that you would receive to possess with intent to

22  distribute?

23  A.    Not in July.  You're adding July in there again

24  during that three-week time period --

25  Q.    Right.  I'm talking about now.  Once you are

1   starting to deal with Linette Crawford in July, not the

2   three-week time period.

3   A.    Oh, well, then, the weight picked up in August.

4   Q.    When you were dealing with Linette Crawford before

5   the weight picked up in August -- from August on --

6   A.    Yes.

7   Q.    -- it was one kilogram per week, approximately,

8   that you would get to possess with intent to distribute

9   in Riverside; correct?

10  A.    Approximately.  In good months, it depends.  If

11  you do it monthly, it's around three to four.

12  Q.    Did you subtract -- excuse me.  Did you divide the

13  30 or 31 days in a month by four to decide when you

14  needed to re-up, or did you do it weekly, as business

15  came weekly?

16  A.    I did it -- I did it as the drugs ran out.

17  Q.    But approximately three to four kilograms a month

18  you would get during that time period; is that correct?

19  A.    Yes.

20  Q.    And that would average to about a kilogram a week

21  on a good month; correct?

22  A.    Yes.  And three on a bad month.

23  Q.    And business was pretty good in Riverside

24  throughout all the time period; is that correct?

25  A.    That's fair to say.

1   Q.    Now, the cocaine that you received when it was

2   packaged, did you receive it all in one package or in

3   separate packages?

4   A.    Separate packages.

5   Q.    How many separate packages would you receive?

6   A.    Four.

7   Q.    Okay.

8             And how tightly were they packed?

9   A.    What do you mean, how tightly were they packaged?

10  Q.    You heard Detective Sullivan, I think, testify

11  that sometimes cocaine is packaged so tightly that it's

12  like in a brick-type form?

13  A.    Yes.

14  Q.    And that also it could be in a bag form, if it

15  was --

16  A.    Well, the majority of the time I already had it

17  broken down in quarter-keys.

18  Q.    Okay.

19            And how tightly were the quarter-keys

20  wrapped?

21  A.    Just like Defense Exhibit 1.

22  Q.    Did you distribute and sell all of that cocaine and

23  then later, when you were dealing crack cocaine in

24  Riverside, during the conspiracy, did you do that all

25  yourself, or did you have other persons that would help

1    you?

2    A.    I would do the majority of the stuff myself.  What

3    do you mean by people helping me?

4    Q.    Well, there was testimony when Linette Crawford

5    testified -- and I think maybe Faye Bullock, too, but

6    I'm not sure of that -- that there would be people that

7    would tout or run for you?  In other words, they would

8    go out.  They would see a customer.  They would find out

9    what the customer would want, come back to you with

10   either the customer's money or the customer's order and

11   say, The customer wants X amount of cocaine or crack

12   cocaine.  And then give you the money.  You'd give them

13   the cocaine or the crack and they'd take it to the

14   person.

15   A.    I know one person who did that.  I don't know

16   numerous people.

17   Q.    Well, who was the one person that did that?

18              MR. BENSON:  Objection.  I would object to

19   him having to be required to name any individual in this

20   regard.  I don't think that's relevant to the hearing

21   that we have today.  There has been testimony that there

22   was one person.

23              THE COURT:  Well, let me just see what the

24   relevance is.

25              MR. PRETTYMAN:  Well, your Honor, there was

1    testimony about there being runners back and forth.  One

2    of the things that's going to be important is the

3    quantity of drugs that we're dealing with.  If there are

4    numerous people like that, and I want to ask him about

5    some specific people, I'm not going to know whether I'm

6    talking about the same person or not unless I know the

7    person's name.

8              MR. BENSON:  Your Honor, I don't think that

9    this gentleman should be required to name any individual.

10   That's not the purpose of today's hearing.  There has

11   been testimony from, I think, one individual, Linette or

12   Faye -- I'm not sure I remember who -- that said there

13   was one person that -- I forget the words she used.  It

14   wasn't run.  But touted or something?  I forget what the

15   word was.  And that was the extent of the testimony:

16   One person.

17             Mr. Chambers appears to be verifying that.

18   It's certainly not relevant for him to name that

19   particular individual.  And to the extent that the

20   Government intends to ask him about specific people, I

21   would object, because, again, I don't think that he

22   should be required to affirm or disaffirm particular

23   individuals that he may have had dealings with.  We

24   are talking about weight here only and that's the

25   purpose of the sentencing hearing.

1           MR. PRETTYMAN:  I know another way that I

2     could perhaps ask the question.

3           THE COURT:  All right.  You just want to

4     identify different people without the identity, so you

5     can give them code names or is that what you were going

6     to do, or nicknames?

7           MR. PRETTYMAN:  The way I wanted to at least

8     start it, your Honor, is asking whether it's either of

9     the two women that were cooking with him that taught him

10    how to cook cocaine into crack.  I don't think that

11    would cause an objection.

12          MR. BENSON:  No, I don't have any problems.

13          MR. PRETTYMAN:  And as we go on, if I ask the

14    question again and I can't say it in either some type of

15    code way or whatever, then I guess Mr. Benson can raise

16    the objection.  But I think I've got a way that satisfies

17    what he wants, gets me where I want to be at least now,

18    and then can pursue this later, if it's appropriate, if

19    that's acceptable to the Court.

20          THE COURT:  All right.

21    BY MR. PRETTYMAN:

22    Q.    Mr. Chambers, you mentioned that there were two

23    women that cooked -- that taught you how to cook cocaine

24    into crack; correct?

25    A.    Yes.

1   Q.    These are two separate women; is that right?

2   A.    Yes.

3   Q.    The person that would do the running or the touting,

4   as I described it earlier for you with the customers and

5   the like, that's a different person than these two women;

6   is that correct?

7   A.    Yes.

8   Q.    I'm going to call that person at least for now the

9   grunt or the touter.

10  A.    The runner.

11  Q.    The grunt?  I will call them whatever you want.

12  I'm just trying to differentiate.  The grunt that you

13  have that would run to the person, find out what their

14  order was, come back to you with the money, you give them

15  the cocaine and go back for it.  The grunt person, that

16  person would do that for you periodically?

17  A.    Every day.

18  Q.    Every day?  When you would be selling in Riverside,

19  out of the back of Faye's house?

20  A.    Yes.

21  Q.    And that person would distribute cocaine and crack,

22  depending on what the person who's the customer ordered

23  from you?

24  A.    What time period are you talking about now, as far

25  as the crack?

1   Q.    Well, whenever -- whenever -- that's why it is

2   hard without names.  Whenever the person would come to

3   you and ask you for a drug, and if you had that drug,

4   whether it be cocaine or crack, and that person, the

5   runner, the grunt person that you described, had the

6   money, you would give them that quantity of drug to take

7   back to the person.

8   A.    Well --

9   Q.    If you had cocaine or crack?

10  A.    Yeah.

11  Q.    Okay.

12          And that person, the grunt person, would they

13  get paid by you anything for this?

14  A.    Sometimes.

15  Q.    Okay.

16          They would get a piece?

17  A.    Yes.

18  Q.    Or small amount of money?

19          But the majority of the money came to you?

20  A.    That's correct.

21  Q.    Because it was your drugs; correct?

22          And if, for some reason, you saw the person

23  that the runner was dealing with, thought it might be a

24  police officer or an informant or something, would you

25  stop the person from dealing or would you not give the

Chambers - cross                76

1   drugs?

2   A.    Answer that -- ask that again?

3   Q.    That was poorly phrased.  Let me get away from

4   that.

5           The person, the first person, the first

6   woman that cooked cocaine into crack --

7   A.    Yes.

8   Q.    -- who taught you how to do that at Faye Bullock's

9   house -- I guess I'm going to call her Woman No. 1.

10  A.    Woman No. 1.

11  Q.    You asked her how to teach you to cook cocaine

12  into crack; is that correct?

13  A.    That's right.

14  Q.    And you knew from experience or hearsay on the

15  street that she knew how to cook cocaine into crack; is

16  that right?

17  A.    Yes.

18  Q.    You went to her, she didn't come to you; is that

19  right?

20  A.    That's correct.

21  Q.    And when she cooked cocaine -- when she assisted you

22  by cooking the cocaine into crack cocaine, she was cooking

23  your cocaine into crack cocaine; correct?

24  A.    That's correct.

25  Q.    And she was using your baking soda, your mixing

Chambers - cross                    77

1   bowl, whatever it is that you would consider your part

2   of Faye's house that you were paying for at that time;

3   correct?

4   A.    Yes.

5   Q.    Did that person, that first woman, did you give her

6   any money or any cocaine or crack for helping you out

7   then?

8   A.    I think I gave her powder.

9   Q.    Okay.

10         And did you give her more or less powder than

11   the powder cocaine that she cooked into crack for you?

12   A.    Less.

13   Q.    So that the majority -- all of the product she

14   cooked went to you; is that right?

15   A.    Yes.

16   Q.    And you gave her some small amount, personal use

17   amount, for her efforts; is that right?

18   A.    For what?

19   Q.    For her efforts of cooking the cocaine into crack?

20   A.    Yes.

21   Q.    You gave her powder?

22   A.    Yes.

23   Q.    Some personal use amount?

24   A.    Yes.

25   Q.    The second woman, I will call her the second lady

1    or second woman, you asked her to cook cocaine into

2    crack for you at Faye Bullock's house?

3    A.    That's correct.

4    Q.    And you heard about her from either on the street

5    or just knowing that she knew --

6    A.    I knew she got high and she probably have

7    knowledge about it.

8    Q.    Okay.

9                And did she use your cocaine to cook into

10   crack at that time?

11   A.    Yes.

12   Q.    And did she use your mixing bowl, baking soda?  It

13   was your stuff?

14   A.    Yes.

15   Q.    And your percentage of Faye's kitchen, whatever it

16   was that you were paying the money for, it was -- I mean,

17   it wasn't done at her house, the second woman's house?

18   A.    No, it wasn't.

19   Q.    Did you pay her anything for cooking the cocaine

20   into crack for you?

21   A.    Yes.

22   Q.    What did you pay her?

23   A.    Powder.

24   Q.    Again, a small personal use amount of powder

25   cocaine?

1    A.    Yes.

2    Q.    The crack cocaine that was cooked there, you kept

3    that, you sold that; is that right?

4    A.    That's correct.

5    Q.    Now, there came a time when you felt comfortable

6    enough to try it yourself; is that right?

7    A.    Yes.

8    Q.    And you cooked it the same way you saw the two

9    women cook it; is that right?

10   A.    That's correct.

11   Q.    And the two women, when they cooked the cocaine

12   into crack cocaine, used cocaine hydrochloride, baking

13   soda, sodium bicarbonate, water, heated it up, and

14   cooled it down.  That became the crack; is that right?

15   A.    That's correct.

16   Q.    And each time that you cooked cocaine into crack,

17   as you described to Mr. Benson, and that we're going to

18   talk about, did you make it the same way?

19   A.    Yes.  I tried to make it the same way they just

20   showed me.

21   Q.    Now, the first time I think you were telling Mr.

22   Benson yesterday you used not the mixing bowl that

23   Detective Sullivan got from Faye Bullock, the quart-

24   sized one, 32-ounce one, you used a smaller one, a 16-

25   ounce Pyrex?

1   A.    It might be an 8-ounce.  I don't know.  There's

2   smaller ones.

3   Q.    Okay.

4         And the Pyrex bowl that you used before, you

5   used that for how many cooks of the cocaine into crack

6   cocaine before you went to the bigger bowl?

7   A.    Four.

8   Q.    When you cooked the cocaine into crack cocaine,

9   you used seven -- first, 3-1/2 grams the two times the

10  ladies cooked it for you?

11  A.    Mm-hmm.

12  Q.    7 grams.  And the most you cooked was an ounce of

13  powder cocaine, cocaine hydrochloride into crack?

14  A.    The most I cooked what?

15  Q.    The most you cooked of cocaine hydrochloride into

16  crack was one ounce at a sitting?

17  A.    Oh, at a time?  That's correct.

18  Q.    And you were putting one ounce of cocaine

19  hydrochloride, one ounce of baking soda.  How many

20  ounces of water?

21  A.    I don't know how many ounces of water.  I never...

22  Q.    Just enough to make it float?

23  A.    Moisturize, saturate it.

24  Q.    So it would be an ounce or less of water?  Just

25  enough so that it would float so you could boil it?

1    A.    An ounce?  I'm not real good with liquid weights.

2    Q.    But it was enough to make it float?

3    A.    It was enough to make it saturate the -- the

4    cocaine and the baking soda.

5    Q.    Okay.

6          And then you would heat it up.  And when you

7    were done, you would scoop out the crack, either ice it

8    down and then it would become the crack that you would

9    sell; correct?

10   A.    Yes.

11   Q.    Now, when you were using Faye Bullock's residence

12   to store the cocaine and the crack cocaine, when you were

13   selling it, you would keep the drugs in the overhang

14   outside her back porch roof; is that right?

15   A.    Can you say that again?

16   Q.    When you would be selling the cocaine or crack

17   cocaine when you were at Faye Bullock's house, you

18   wouldn't keep it on your person all the time?

19   A.    No.

20   Q.    Because that was bad for business.  You could get

21   ripped off?

22   A.    Yes.

23   Q.    You would keep it in the roof overhang, where you

24   would be able to go get it as either the runner or the

25   customer came up to you to buy it; is that correct?

1    A.    Yes.

2    Q.    And you would also keep whatever quantity was not

3    cooked into crack cocaine or whatever quantity of powder

4    cocaine that you weren't selling, you would keep that

5    inside Faye Bullock's house, after you were allowed to

6    be inside her house; correct?

7    A.    Yes.

8    Q.    Now, in connection with the -- with Linette

9    Crawford, you're the one that approached her first to

10   have her hold your cocaine for you in July of 1997, when

11   the police were in the area, you were afraid to get

12   arrested or stopped; is that correct?

13   A.    That's correct.

14   Q.    And after Faye Bullock asked you through an

15   intermediary for money and you said no, you came back to

16   her the next day and asked her to use her steps and then

17   it evolved into using her house as a place for you to

18   first sell and later store or cook your cocaine?

19   A.    That's correct.

20   Q.    And it was not Faye Bullock or Linette Crawford

21   or either of the two ladies that were the cooks or the

22   grunt runner that we're talking about, they didn't --

23   they were not the ones that would decide which drugs to

24   sell or when to sell or where to sell; is that correct?

25   A.    That's correct.

Chambers - cross                    83

1    Q.    You're the one who determined what drugs to sell

2    throughout the conspiracy; is that right?

3    A.    Yes.

4    Q.    When to sell the drugs during -- you're the one

5    that determined when to sell the drugs during the

6    conspiracy?

7    A.    Yes.

8    Q.    You're the one that determined to whom to sell

9    the drugs to, who you would deal with and who you

10   wouldn't during the conspiracy?

11   A.    That's correct.

12   Q.    You're the one who decided which days that you

13   would possess with intent to distribute these drugs and

14   which days you wouldn't during the conspiracy; is that

15   right?

16   A.    Yes.

17   Q.    You were the one who actually bought the drugs,

18   cocaine, and then the cocaine that you cooked into crack

19   that was used to be sold and possessed with intent to be

20   distributed during this conspiracy; is that right?

21   A.    Yes.

22   Q.    And it was either your money or the money that, or

23   the drugs were fronted to you on consignment that bought

24   all the cocaine and crack cocaine that was distributed

25   during this conspiracy; is that right?

1    A.    That's correct.

2    Q.    You were also the one that received all the money

3    proceeds from selling the cocaine and the crack cocaine;

4    is that correct?

5    A.    What you mean?

6    Q.    In other words, whoever sold the drugs, whether it

7    was you or the runner, the money all came back to you?

8    A.    Yes.

9    Q.    Now, on December 8th, 1997, before the police

10   arrested you, you had the 30 grams of crack cocaine that

11   was in the overhang; correct?

12   A.    Yes.

13   Q.    And some other amount that you can't remember that

14   you had sold that night, because you had sold some crack

15   cocaine?

16   A.    Yes.

17   Q.    And you don't remember the amount?

18   A.    Yes.

19   Q.    On December 8th, 1997, you had the 265.9 or zero

20   nine, whatever it is, grams of cocaine that the police

21   seized that night, various officers, that has been

22   admitted into evidence.  That was yours, too?

23   A.    Yes.

24   Q.    Both of those drugs, it was your plan to sell

25   those drugs?

Chambers - cross                        85

1    A.    Yes.

2    Q.    You also had $1,096, approximately, in your pocket

3    that night?

4    A.    Yes.

5    Q.    Were they -- was that the proceeds from you selling

6    the cocaine and the crack cocaine that night?

7    A.    No.  I had brought some of it out because I was

8    going to give Faye some because she wanted a couple

9    dollars to get started shopping early.

10   Q.    A couple dollars?

11   A.    Oh, I meant to say around about 250.  I was going

12   to give her 250 and I was going to give Linette 250.

13   Q.    So $500 of that was past proceeds of selling drugs;

14   is that correct?

15   A.    Yes.

16   Q.    I'm sorry?  She's got to take down what you said.

17   A.    I said yes.

18   Q.    Now, did you personally package each of the little

19   rocks into the 240 horse-stamped baggies --

20   A.    Yes.

21   Q.    -- that the police seized?  You're the one that

22   did that?  You did it all by yourself with no help?

23   A.    Well, sometimes Nettie would -- not Nettie --

24   Faye would help.

25   Q.    And, particularly, on that night you don't know, or

Chambers - cross                    86

1    can you remember --

2    A.    No.  She was upstairs.

3    Q.    So you did that yourself that night?  Packaged the

4    240 little horse bags?

5    A.    Yes.

6    Q.    On the night of your arrest, December 8th, 1997,

7    did you lie to the police about anything?

8    A.    What was that?

9    Q.    On December 8th, 1997, did you lie to the police

10   when you were arrested?

11   A.    Did I lie?

12           MR. BENSON:  Objection, your Honor.  I think

13   the statement is too broad.  I know there was a -- there

14   are some representations made by the police that they

15   asked if he had drugs in the house and he said no.  I

16   certainly don't think that's relevant to the issue at

17   hand.

18           THE COURT:  Why don't you ask him a more

19   specific question?

20           MR. PRETTYMAN:  Yes, your Honor.

21           THE COURT:  If you had reason to believe he

22   lied, why don't you ask him about that?

23   BY MR. PRETTYMAN:

24   Q.    When the officers came in and they told you they

25   were searching for guns or drugs -- is that correct?

1   A.    Yes.

2   Q.    And you told them there was nothing there?

3   A.    Yes.

4   Q.    And that's a lie; correct?

5   A.    Yes.   That wasn't the truth.

6   Q.    And then later, after they found the guns, you

7   told them there was only the guns there; correct?

8   A.    Correct.

9   Q.    And that's a lie, too; correct?

10  A.    Correct.

11  Q.    Now, before you gave your statements today, have

12  you reviewed the sentencing guidelines that apply to

13  your offense, with the various drug quantities?

14  A.    Yes.

15  Q.    And are you very familiar with the sentencing

16  guidelines as they deal with the quantities of cocaine

17  and crack cocaine?

18  A.    Yes.   I familiarized myself with the manual.

19  Q.    All right.

20            And you knew that even on May -- I want to

21  say 28th, but whatever day it was in 1997, when you gave

22  the statement that Detective Sullivan testified to?  You

23  were aware of the sentencing guidelines, what effect the

24  weights of drugs had on your sentence?

25  A.    I was aware of that before that, when they told me

1    that quantity plays a big part with crack.   I

2    familiarized myself immediately with what I was getting

3    myself into.  That's correct.

4    Q.    Sometime around December of 1997, after your arrest,

5    you became immediately familiar with the fact that the

6    weight of the cocaine and the crack cocaine would affect

7    your sentencing guidelines and ultimately your sentence;

8    is that correct?

9    A.    That's correct.

10   Q.    During the conspiracy, up until the time of your

11   arrest on December 8th of 1997, did you daily consume

12   alcohol and marijuana?

13   A.    Yes.

14   Q.    And that daily consumption was approximately one

15   pint of hard liquor, a 12-pack of beer and a marijuana

16   joint?

17   A.    Yes.

18   Q.    Now, when you talked to Mr. Benson earlier this

19   morning, you used the word "joint" in referring to -- I

20   think you were talking about a quantity of cocaine?

21   A.    Yes.

22   Q.    That was not a marijuana cigarette you were talking

23   about?

24   A.    No.

25   Q.    That was some quantity of cocaine?

1    A.    Yes.

2    Q.    Is that right?

3    A.    Yes.

4    Q.    And what quantity of cocaine do you call a joint

5    when you were referring to Mr. Benson?

6    A.    That was a quarter of a key.

7    Q.    Quarter of a kilogram?

8    A.    Which is 9 ounces.

9            MR. PRETTYMAN:  May I have a moment, please,

10    your Honor?

11            THE COURT:  All right.

12            MR. BENSON:  Just a couple questions.

13            MR. PRETTYMAN:  I asked for a moment.

14            MR. BENSON:  Oh, I thought you said you had

15    nothing else.  Sorry.

16            (Pause.)

17            MR. PRETTYMAN:  Your Honor, I just have one

18    or two more questions, please.

19            THE COURT:  All right.

20    BY MR. PRETTYMAN:

21    Q.    Mr. Chambers, on December 8th, 1997, you brought

22    the money over, the 1,097, whatever it was, whatever part

23    that you were going to give to Faye Bullock and Linette

24    Crawford, you brought that money with you when you came

25    that night?

1   A.   Yes.

2   Q.   What time of the evening did you come?

3   A.   What time of the evening I came that night?

4   Q.   Yes.

5   A.   I think I came around 6:30.  Well, as soon as it

6   gets dark, I came out.  So whatever time it gets dark.  I

7   know it gets dark around 6:00 o'clock, 6:30.

8   Q.   And after you came there, was Faye Bullock there?

9   A.   Faye Bullock was there.

10  Q.   Okay.

11  A.   That particular night.  She had switched jobs and

12  worked there.  I'm not going to say where she worked at,

13  but she was getting home earlier at this point.

14  Q.   So she was home when you got there?

15  A.   Yes.

16  Q.   And she was there for the majority of the night,

17  before she went to bed; is that correct?

18  A.   Yes.

19  Q.   And --

20  A.   I think she was there the entire night.

21  Q.   All right.  That's fine.  I'm just asking you --

22  A.   Okay.

23  Q.   -- what your recollection is.

24        December 8th, 1997, did Linette Crawford

25  bring over the bag of the drugs, the scales, the stuff to

1   you at Faye Bullock's residence?

2   A.    I don't think I was there when the drugs actually

3   arrived.

4   Q.    Was Linette Crawford there at any time when you

5   were there that night?

6   A.    Did I see Nettie that night?  No, I don't think I

7   seen Nettie that night.

8   Q.    Okay.

9   A.    I didn't see Linette that night.

10  Q.    Did you see -- strike that.

11          MR. PRETTYMAN:  I have no further questions,

12  your Honor.  Thank you.

13          THE COURT:  All right.

14                  REDIRECT EXAMINATION

15  BY MR. BENSON:

16  Q.    Darryl, that night that you got arrested, December

17  the 8th --

18  A.    Yes?

19  Q.    -- you were out selling drugs on the porch.  Did you

20  see the police exit the van and start to come into Faye's

21  house?

22  A.    I seen -- can I take you back a couple steps first?

23  Q.    Go ahead.

24  A.    I think two State Police cars came first around the

25  corner.

Chambers - redirect                92

1    Q.    All right.

2    A.    So as usual, the procedure was for me to duck in

3    the house, especially when two State guys come.

4    Q.    Right.

5    A.    To duck in the house.  So I was looking out the

6    house, right.  And what I seen was, I seen a car pull up.

7    Q.    Right.

8    A.    And I seen a guy jump out with a battering ram.  I

9    think that's a battering ram, what they call it.

10   Q.    Right.

11   A.    That's when I proceeded to go upstairs.

12   Q.    So you saw the police coming.  You had weapons in

13   the cabinet, in the kitchen.  You didn't run to the

14   weapons?

15   A.    No, sir.

16   Q.    To grab some weapons to shoot or defend the house

17   or whatever.  You ran upstairs; isn't that correct?

18   A.    Correct.

19   Q.    Is that the furthest area away from the weapons?

20   A.    Yes.

21   Q.    Those two weeks that you were rehabilitating

22   yourself after you had been shot, did you sell any drugs

23   or did you deal in any cocaine transactions for those

24   two weeks?

25   A.    No, sir.

1  Q.    The summer of '96, can you estimate in your own

2  mind for the Judge's edification or understanding the

3  total amount of powdered cocaine you may have sold that

4  summer of 1996?

5  A.    I really can't do it with a good conscience.  I

6  really can't approximate.

7  Q.    Okay.

8          You can't even guesstimate, as they say?  If

9  you can't, that's fine.  I don't want to force you to

10 make a number that you can't live with.

11         Let me ask you this:  The fact that you are

12 familiar with the sentencing guidelines, isn't that

13 pretty commonplace with people that -- in Fairton,

14 waiting to be sentenced?  Doesn't everybody focus on

15 those guidelines?

16 A.    Well, the people who are concerned about their

17 lives will partake in knowing the guideline manual,

18 because it's important.

19 Q.    All right.

20 A.    It's like -- I don't want to use it, but it's like

21 your Bible.  It's a matter of life and death.

22 Q.    Let me ask you this:  The fact that you are

23 familiar with the guidelines, is that causing you in any

24 way to not tell the truth or to lie today at this

25 hearing?

1   A.     No, sir.

2   Q.     I mean, that is not influencing your testimony, as

3   far as being truthful?

4   A.     No, sir.

5             MR. BENSON:  I have nothing further, your

6   Honor.

7             THE COURT:  All right.  You may step down.

8                   (Witness excused)

9                     - - -

10            MR. BENSON:  Your Honor, we have no other

11  evidence to present.

12            THE COURT:  All right.  Do you want to

13  present a rebuttal case?

14            MR. PRETTYMAN:  May I may have one minute,

15  please, your Honor?

16            (Pause.)

17            MR. PRETTYMAN:  Thank you, your Honor.  The

18  Government has no rebuttal case.

19            THE COURT:  All right.  Let's go back into

20  our discussion that we had yesterday about how we're

21  going to put these things -- these issues in context.

22            MR. BENSON:  Excuse me, your Honor.  Not to

23  interrupt you, is there a tissue or something?

24            Thank you very much.

25            THE COURT:  The question is how we're going

1    to put these matters in context.  I had mentioned

2    yesterday that I'd be more comfortable waiting to get a

3    copy of the transcript before I reached any conclusion.

4    If you all want to make closing presentations, you're

5    welcome to.  It might be more efficient to just put them

6    in a letter.  But I'm open to suggestions.  I don't know

7    what you want to do, how you want to do it.

8              MR. PRETTYMAN:  Your Honor, I think that with

9    three days of transcripts, if the Court would permit us

10   to get a copy of the transcript for purposes of sending

11   the letter memorandum as opposed to just -- I think

12   that's what your Honor meant as opposed to just writing

13   a letter about what we recall now to send to the Court.

14             THE COURT:  That's fine.  You can do it

15   either way.  But I think it's probably more helpful --

16   unless people see a problem with that.  My thought is

17   I'd rather get the transcript, have people look at it,

18   and see what they think the testimony shows, what

19   judgments have to be made.

20             So that's what I would prefer.

21             Is there any problem with my taking my time

22   to try to resolve this issue?  I take it there's not;

23   right?

24             MR. BENSON:  No.  He's looking at a ten-year

25   minimum mandatory.

1          THE COURT:  That's what I thought.  So why

2   not wait, get a copy of the transcript, make sure we're

3   all clear about what witnesses said and what the theory

4   of facts each side is going to rely on for the purposes

5   of presenting their case.

6          On this question about relevant conduct and

7   the time frame applicable to the relevant conduct, I am

8   not familiar with research on the issue of the scope of

9   relevant testimony at the sentencing hearing.  But I

10  operate under the assumption that the presentence report

11  and the objections to the presentence report set the

12  scope for what the issues are going to be here, and that

13  when Mr. Benson stood up, I think his objection would

14  have been that, We weren't on notice -- now, this may not

15  be correct, because it may be in the presentence report --

16  We weren't on notice that the Government was going to

17  argue that it was a longer period of time that would be

18  covered for the purpose of determining relevant conduct

19  and, therefore, we weren't prepared to address that issue

20  at the hearing.

21          I'm not saying I've made a final decision one

22  way or the other on that, but I think that's sort of --

23          MR. BENSON:  It's not in the presentence

24  report.  I don't know if you've read the presentence

25  report.  I don't know how that works.

1          THE COURT:  First of all, you can't ask me

2     any questions.

3          MR. BENSON:  I'm sorry.  I apologize.  I

4     guess I'm saying rhetorically --

5          THE COURT:  I've read the presentence report.

6     I will volunteer the information.

7          MR. BENSON:  Okay.  I'm sorry.  I didn't know

8     how it worked, if you read it and then we have the hearing?

9          THE COURT:  I'm just teasing you.  I've read

10    the presentence report.  I believe I understand what the

11    circumstances are.  I know why Mr. Prettyman went to the

12    issue.  It's just a question of whether it's appropriate

13    to take that shift.  And you all may want to look at that

14    in the context of what you write to me.  That is, you've

15    got the Wilson opinion there that talks about time frames.

16    It's also just the question of what's the scope of the

17    hearing and what's fair notice and what's the right result

18    to reach.

19          MR. PRETTYMAN:  Your Honor, just for purposes

20    of perhaps saving Mr. Benson or the Court some time, I

21    believe, based upon the admissions that the defendant made

22    in response to those questions, that I don't think that it

23    has an effect on the sentencing guidelines.

24          So just as a courtesy to the Court and Mr.

25    Benson, in terms of spending time on that, perhaps for Mr.

1  Benson's purposes, to look to see if that affects the

2  range before that comes up, because at least standing

3  here today, I don't think that the weights that he

4  admitted to --

5              THE COURT:  That's fine.

6              MR. BENSON:  So we're not making that an

7  issue, then?

8              THE COURT:  That's what it sounds like.

9              MR. BENSON:  That's what it sounds like.

10             THE COURT:  Sounds like you don't have to do

11 all of that research.

12             MR. BENSON:  That's all right.

13             THE COURT:  That's fine.

14             All right.  What we'll do, we'll get a copy

15 of a transcript.  You can reach an agreement on how you

16 want to present it to me and whether you want to do

17 simultaneous or one after the other.  Just let me know

18 by letter what you intend to do.  If you can otherwise

19 resolve the issues before I get them resolved, that's

20 fine, too.

21             MR. BENSON:  How long would it take to get

22 the transcript, approximately?  Are ve talking weeks or

23 months?

24             THE COURT:  It's going to be probably a

25 couple weeks.

1      MR. BENSON:  There's no urgency.

2      MR. PRETTYMAN:  Your Honor, can we, based

3  upon the day we receive the transcripts, then send to

4  your Honor after mutual agreement the briefing --

5      THE COURT:  Yes.  You don't know what your

6  schedule will be the day it appears.  You can read it

7  and call Mr. Benson up, say, How about we do the

8  following...

9      MR. BENSON:  That's fine, Judge.

10     THE COURT:  Again, after you reread the

11  transcript testimony, you may want to think about what

12  your positions are on all of this, because maybe you

13  can resolve it otherwise.

14     MR. BENSON:  We've been trying, but it's

15  tough to resolve anything with the Government.

16     THE COURT:  All right.  Court is in recess.

17  I will be back in about 15 minutes for another matter.

18          (Court recessed at 12:00 p.m.)

19                    - - -

20              I N D E X

21  DEFENDANT'S TESTIMONY CONTINUED   DIRECT CROSS REDR RECR

22  Darryl Chambers, Resumed -------      3    35   91   ---

23                    - - -

24

25

I hereby certify that the foregoing is a true
and accurate transcript from my stenographic
notes in the proceeding.

Valerie J. Gunning

Official Court Reporter
U.S. District Court